UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| LENARD DIXON, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) No. 2:17-cv-00080-JMS-DLP |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Respondent. | ) |

**Order Denying Motion for Relief Pursuant to 28 U.S.C. § 2255
and Denying a Certificate of Appealability**

For the reasons discussed in this Entry, the motion of Lenard Dixon for relief pursuant to 28 U.S.C. § 2255 must be **denied** and the action **dismissed with prejudice.** In addition, the Court finds that a certificate of appealability should not issue.

### I.  § 2255 Motion Standards

A motion pursuant to 28 U.S.C. § 2255 is the presumptive means by which a federal prisoner can challenge his conviction or sentence. *See Davis v. United States*, 417 U.S. 333, 343 (1974). A court may grant relief from a federal conviction or sentence pursuant to § 2255 "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). The scope of relief available under § 2255 is narrow, limited to "an error of law that is jurisdictional, constitutional, or constitutes a fundamental defect which inherently results in a complete miscarriage of justice." *Borre v. United States*, 940 F.2d 215, 217 (7th Cir. 1991) (internal citations omitted).

## II. Factual Background

In May 2013, while Mr. Dixon was incarcerated at the United States Penitentiary in Terre Haute, Indiana, a grand jury charged Mr. Dixon with being an accessory after the fact to murder, in violation of 18 U.S.C. § 3. Another inmate, co-defendant William Bell, was charged with committing premeditated murder of another inmate, Brian Pendelton, in violation of 18 U.S.C. § 1111. Mr. Dixon and Bell were tried jointly before a jury the following year.

During *voir dire*, the Court advised the jury that "[i]f at any time you realize you know something about the case, you know a witness or you know the Defendant, … you must inform the courtroom deputy at your earliest opportunity." *USA v. Bell, et al.*, No. 2:13-cr-00021-JMS-CMM-2 (S.D. Ind.) (hereinafter, "Crim. Dkt."), Crim. Dkt. 136 at 7 [sealed]. The Court emphasized the need to provide the defendant a fair trial and to ensure that the "people who are selected as jurors can keep an open mind throughout trial" and decide the case "based solely on the evidence that is presented" in the courtroom. Crim. Dkt. 136 at 8, 15 [sealed]. The Court read the names of potential witnesses in the case, including the name "Nurse T. Bixler, who works at the Bureau of Prisons." Crim. Dkt. 136 at 16 [sealed]. When the Court asked the prospective jurors if they knew any of the named witnesses, only Prospective Juror #21, who ultimately was not selected as a juror, stated he knew a witness. Crim. Dkt. 136 at 16 [sealed].

Nurse Bixler testified the morning of the second day of the three day trial. Crim. Dkt. 139 at 143. She testified that she performed an injury assessment of Mr. Bell three days after the murder and observed a one centimeter abrasion on the inside of Mr. Bell's lower lip. Crim. Dkt. #139 at 145-46. Nurse Bixler further testified that when asked how he got the abrasion, she believed Mr. Bell refused to answer. Crim. Dkt. 139 at148.

During the lunch break, the Court was advised that Juror #1 was acquainted with Nurse Bixler. Crim. Dkt. 139 at 165. In the presence of the parties and outside the presence of the other jurors, the Court questioned Juror #1 as to the nature of her relationship with Nurse Bixler. Crim. Dkt. 139 at 165-66. Juror #1 stated that she knew Nurse Bixler only because her husband has repaired Nurse Bixler's vehicles. She stated that she had called Nurse Bixler to advise her when the repairs were completed and the cost of the repairs. Crim. Dkt. 139 at 166. Juror #1 confirmed that her relationship with Nurse Bixler did not affect her ability to be fair and impartial. *Id*. No party expressed concern or objected to continuing the trial with Juror #1 serving as a juror. *Id*.

After a three-day jury trial, Mr. Bell and Mr. Dixon were both convicted. Mr. Dixon was sentenced to a 156-month term of imprisonment, to be served consecutively to the federal sentence he was serving at the time of Pendelton's murder. Crim. Dkt. 114. The Court entered judgment on October 31, 2014. Crim. Dkt. 114.

On November 6, 2014, Mr. Dixon filed a notice of appeal. Crim. Dkt. 124. In his appeal, Mr. Dixon challenged the sufficiency of evidence and argued that the district court erred by allowing his legs to be shackled during the trial. *See United States v. Bell*, 819 F.3d 310 (7th Cir. 2016). On February 17, 2016, the Seventh Circuit affirmed Mr. Dixon's conviction and sentence in all respects. *Id.* The Seventh Circuit held that (1) the "district judge applied the correct legal standard and identified the facts that, in her considered judgment, presented a special need for restraints" and that "appropriate precautions [were taken] to minimize risk that the jury could infer that Dixon was shackled"; and (2) "[t]he evidence was more than sufficient to support Dixon's conviction as an accessory after the fact. *Id.* at 320-23.

On February 14, 2017, Mr. Dixon filed a motion for post-conviction relief pursuant to 28 U.S.C. § 2255. The United States responded and Mr. Dixon has replied. The action is ripe for resolution.

## III. Discussion

Mr. Dixon seeks relief pursuant to § 2255 alleging: (1) that his due process rights were violated when the Court ordered that four United States marshals be positioned around the defense table throughout the trial; (2) prosecutorial misconduct; (3) a violation of *Brady v. Maryland*, 373 U.S. 83 (1963); and (4) juror bias.

### A. Procedural Default

The United States argues that Mr. Dixon's claims are procedurally defaulted because they should have been raised on direct appeal, but were not. *See* dkt. 10 at 12.

The general rule is that "claims not raised on direct appeal may not be raised on collateral review unless the petitioner shows cause and prejudice." *Massaro v. United States,* 538 U.S. 500, 504 (2003). "A § 2255 petition is not a substitute for direct appeal." *Prewitt v. United States*, 83 F.3d 812, 816 (7th Cir. 1996) (internal citations omitted). However, constitutional claims may be raised for the first time in a collateral attack if the petitioner can show cause for the procedural default and prejudice from the failure to appeal. *Massaro,* 538 U.S. at 504. In order to show cause for a procedural default, Mr. Dixon must demonstrate that some objective factor external to the record impeded his efforts to bring a claim on direct appeal. *Coleman v. Thompson,* 501 U.S. 722, 753 (1991). If a petitioner is unable to demonstrate both cause and prejudice, he may be able to obtain habeas review only if he can persuade the court that the dismissal of his petition would result in a fundamental miscarriage of justice – that is, "in an extraordinary case, where a

constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 495 (1986).

In his reply, Mr. Dixon does not address the United States' claim that he has procedurally defaulted his claims. *See* dkt. 13. Moreover, he does not demonstrate cause and prejudice to overcome the default. Because Mr. Dixon's claims should have been brought on direct appeal, and were not, his claims here are all procedurally defaulted. Nonetheless, the Court will discuss the merits of his claims below.

### B. Presence of United States Marshals

Mr. Dixon first argues that the Court abused its discretion and deprived him of the presumption of innocence when it order that four United States marshals be positioned around the defense table during trial, even though both defendants were already shackled. Dkt. 1 at 4; dkt. 13 at 1-2.

"A trial judge who is confronted with a potentially disruptive defendant or witness must consider the security of his courtroom and of all those who are in it." *United States v. Brooks*, 125 F.3d 484, 502 (7th Cir. 1997). "[T]he trial judge has wide discretion in determining what is necessary to maintain the security of the courtroom." *Id.* (citing *Lemons v. Skidmore*, 985 F.2d 354 (7th Cir. 1993)). In *Brooks*, the defendant objected to the presence of four Deputy United States Marshals who were seated directly behind the defense table in the courtroom, arguing that he was already wearing hidden stun belts throughout the trial, so the added security of the marshals behind the defendants was not necessary. *Id.* Like Mr. Dixon, the defendant in *Brooks* argued that the presence of the marshals "destroyed any presumption of their innocence and led the jury to think that the defendants were dangerous criminals." The Seventh Circuit held in *Brooks* that

5

because the defendant had a history of violence, the district court acted within its discretion, noting that the court "chose methods of restraint that minimized the risk of prejudice." *Id.*

Here, Mr. Dixon had an extensive history of serious violent conduct. Crim. Dkt. 73. Prior to his incarceration at Terre Haute, Mr. Dixon had been "convicted of multiple offenses, many of which show a propensity for violence against other people, including four armed robbery convictions, a conviction for aggravated robbery, a conviction for carrying a deadly weapon, and a conviction for carjacking with intent to cause harm." *Id.* (internal citations omitted). While incarcerated, Mr. Dixon demonstrated "disruptive and violent behavior," including "possessing dangerous homemade weapons, including a seven-inch piece of sharpened plexiglass," threating bodily harm, and on two occasions, engaging in sexual acts in front of female staff members. *Id.* Based on this history, the Court placed marshals at various locations in the courtroom behind Mr. Dixon to cover any potential security risks. Although Mr. Dixon alleges that these marshals were positioned "around the defence table," during the final pretrial conference, Mr. Dixon's trial counsel agreed to "one [marshal] just north of the exit door, one at the chair next to the marshal" and "one in the gallery." Crim. Dkt. 147 at 66. Despite Mr. Dixon's representations, the marshals were not all clustered around the defense table throughout trial, but instead spread throughout the courtroom in a non-intrusive manner for security purposes. Because Mr. Dixon fails to show the marshal placement deprived him of a fundamentally fair trial, Mr. Dixon's allegation is without merit.

### C. Prosecutorial Misconduct

Mr. Dixon alleges that the prosecutor encouraged its two key witnesses, Lt. Winterberg and Officer Boots, provide false testimony about the handling and securing of the murder weapon. *See* dkt. 1 at 5; dkt. 13 at 6-8. Mr. Dixon has identified only two pieces of what he asserts to be

6

false testimony. First, he identifies Lt. Winterberg's testimony that he took the picture that was submitted by the United States as Exhibit 9K, but the picture Mr. Dixon has submitted is marked "photo by Lt. Crook at 6-18-2011." Dkt. 13-2 at 1. He also disputes Lt. Winterberg's testimony that he took the weapon from the trash can and placed it a cardboard box, alleging that in the video footage, Officer Boots is observed taking the weapon out of the trash can. *See* dkt. 13 at 6-8.

The Supreme Court has clearly established that a prosecutor's knowing use of perjured testimony violates the Due Process Clause. *See Schaff v. Snyder*, 190 F.3d 513, 530 (7th Cir. 1999), citing *United States v. Agurs*, 427 U.S. 97 (1976); *Pyle v. Kansas*, 317 U.S. 213, 215-16 (1942); *Mooney v. Holohan*, 294 U.S. 103, 110 (1935) (per curiam). The Court requires that a conviction obtained by such knowing use of perjured testimony be set aside "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Agurs*, 427 U.S. at 103.

As to his first claim of false testimony, although the photo is marked as "photo by Lt. Crook," there is no indication that the photo submitted by Mr. Dixon was the same as the United States' Exhibit 9K. Moreover, Lt, Winterberg's testimony that the photo "appears to be the photo that I took that evening," is not necessarily false given multiple individuals were likely taking photos while investigating. What is not at dispute is that the photo is an accurate depiction of the weapon as found in the trash can. Moreover, given that "[t]he evidence was more than sufficient to support Dixon's conviction as an accessory after the fact," *Bell*, 819 F.3d at 323, the proper identity of who took just one of many photos presented at trial was unlikely to "have affected the judgment of the jury." *Agurs*, 427 U.S. at 103.

As to his second claim of false testimony, Mr. Dixon is mistaken. At trial, Officer Boots testified that he found the weapon wrapped in the clothing, Crim. Dkt. 138 at 110, but that he left

it in the trash can, and he believes "Lt. Winterberg[,] after he took pictures[,] bagged it up and took it out." *Id.* at 111. Lt. Winterberg's testimony is consistent. Crim. Dkt. 139 at 50-51. Moreover, the proper identity of who boxed up the weapon was unlikely to "have affected the judgment of the jury," *Agurs*, 427 U.S. at 103, where the undisputed evidence showed Mr. Dixon depositing a bundle into the trash can, where a bloody weapon and Bell's bloody clothes were later found.

Mr. Dixon has provided no proof that the testimony of Officer Boots or Lt. Winterberg was false or that the prosecution knew that the testimony was false. The veracity of their testimony and the weight to be given to their testimony was appropriately left for the jury to decide. Thus, it is unlikely there was prosecutorial misconduct in this case.

### D. *Brady* Violation

Mr. Dixon alleges that the prosecutor withheld evidence that would have served to impeach the credibility of Officer Boots, who Mr. Dixon asserts lied about discovering the weapon. Dkt. 1 at 7. Mr. Dixon believes Officer Singleton was the one who found the weapon. Mr. Dixon's theory is that "[e]very officer who was involved inside this murder investigation statement was given to the defense except Officer Singleton Jr. This means that the withheld evidence would have led to the jury to doubt virtually everything the government's eyewitnesses said about the crime." Dkt. 13 at 5-6.

Mr. Dixon's allegations are entirely speculative. He fails to show that the prosecutor actually withheld evidence, and instead merely speculates that: (1) something must have been withheld because it was not produced; and (2) it must have been exculpatory if it was withheld. Accordingly, where Mr. Dixon has not actually identified any exculpatory evidence that was withheld by the prosecution, habeas relief is not warranted.

### E. Juror Bias

Mr. Dixon argues that he was improperly subject to juror bias when it was discovered mid-trial that one of the jurors knew one of the United States' witnesses. Dkt. 1 at 8. Mr. Dixon asserts that the juror committed perjury on the record, which is grounds for a mistrial. Mr. Dixon's claim lacks merit.

"The Sixth Amendment of the United States Constitution guarantees the bedrock principle of trial by an impartial jury." *United States v. Blitch,* 622 F.3d 658, 664 (7th Cir. 2010) (citing *Skilling v. United States*, 561 U.S. 358 (2010)). Absent some real showing otherwise, a jury is presumed to be impartial. *See, e.g., United States v. Siegelman,* 640 F.3d 1159, 1182 (11th Cir. 2011); *United States v. Ruggiero,* 56 F.3d 647, 652 (5th Cir. 1995); *see also Murphy v. Florida,* 421 U.S. 794, 798 (1975). "[C]ourts face a delicate and complex task whenever they undertake to investigate reports of juror misconduct or bias during the course of a trial … any such investigation is intrusive and may create prejudice by exaggerating the importance and impact of what may have been an insignificant incident." *Blitch*, 622 F.3d at 665 (citing *United States v. Abrams*, 137 F.3d 704, 708 (2d Cir. 1998)). A district court "may exclude any person summoned for jury service 'on the ground that such person may be unable to render impartial jury service….'" 28.U.S.C. § 1866(c)(2). When a juror is challenged, the requirement of an impartial jury is satisfied "if the prospective juror has given final, unequivocal assurances, deemed credible by the judge, that for purposes of deciding the case, she can set aside any opinion [she] might hold, relinquish her prior beliefs, or lay aside her biases or her prejudicial personal experiences." *United States v. Allen*, 605 F.3d 461, 464-65 (7th Cir. 2010) (internal quotations omitted).

Juror #1's knowledge of Nurse Bixler was simply that her husband had worked on the nurse's vehicle. Juror #1 did not state that she knew Nurse Bixler personally. Rather, Juror #1

had a tangential business relationship that involved only calling the nurse when her vehicle repairs were done and telling her the price. Juror #1 did not even know Nurse Bixler worked at the prison. The Court asked Juror #1 whether anything about the fact that she had done business with Nurse Bixler would affect her ability to be fair and impartial. She stated, "no." Crim. Dkt. 139 at 166. Mr. Dixon has alleged no bias, no prior beliefs, or prejudice on the part of Juror #1 that could have possibly interfered with her ability to be impartial. The Court found Juror #1's description of her knowledge and her statement that she could be fair and impartial to be credible. Mr. Dixon's right to an impartial jury was therefore not violated when Juror #1 was allowed to continue to serve.

Moreover, the testimony from Nurse Bixler concerning the small abrasion to Bell's inside lower lip was brief and was not significant to the overall evidence presented against Mr. Dixon. In concluding that "[t]he evidence was more than sufficient to support Dixon's conviction as an accessory after the fact," the Seventh Circuit found relevant other evidence presented at trial:

> Dixon's course of action, as revealed by the surveillance video and the other evidence presented at trial, was sufficient to show that he aided Bell with the intent to hinder his apprehension, trial, and punishment for murder. § 3. We have already spoken of the apparent choreography between Bell and Dixon: Dixon left their cell shortly after Bell did, took a seat outside of the cell, and then, as Bell returned from Cell 105 shirtless and with a bundle in his hand, arose and walked back into their cell (103) ahead of him. A moment later, Dixon emerged from the cell with a bundle of clothing in his hand, walked right by Pendelton as he struggled to exit his cell and as blood was squirting from his neck, proceeded to Cell 113, and then walked from that cell to the day room trash can, where he deposited the bundle and covered it over. One could readily infer that this discarded bundle comprised Bell's bloody clothing and the murder weapon (as the search of the trash can later revealed), and that Dixon was knowingly disposing of evidence of the fatal attack on Pendelton. One could also infer that the weapon had been cleaned while Dixon was in Cell 113. Moreover, during the investigation into the incident, Dixon made inconsistent and demonstrably false statements to investigators, from which one might reasonably infer a consciousness of guilt. *See United States v. Webber*, 536 F.3d 584, 598 (7th Cir. 2008); *United States v. Shorter*, 54 F.3d 1248, 1260 (7th Cir. 1995). Considered collectively, all of this evidence readily and reasonably supports an inference that Dixon was privy to Bell's intent to murder Pendelton from the beginning, and in particular that he gave aid to Bell after the murder with the intent to hinder the investigation, prosecution, and punishment of Bell for that offense.

*Bell*, 819 F.3d at 323.

Thus, Mr. Dixon's claim of juror bias is also meritless.

### IV. Conclusion

For the reasons explained in this Entry, Mr. Dixon is not entitled to relief on his § 2255 motion. There were no violations of his due process rights, no prosecutorial misconduct, no *Brady* violation, and no juror bias. Accordingly, his motion for relief pursuant to § 2255 is **denied** and this action is dismissed with prejudice. Judgment consistent with this Entry shall now issue and the clerk shall **docket a copy of this Entry in No. 2:13-cr-00021-JMS-CMM-2.** The motion to vacate shall also be **terminated** in the underlying criminal action.

### V. Certificate of Appealability

Pursuant to Federal Rule of Appellate Procedure 22(b), Rule 11(a) of the Rules Governing § 2255 Proceedings, and 28 U.S.C. § 2253(c), the Court finds that reasonable jurists would not find "it debatable whether the petition states a valid claim of the denial of a constitutional right" and not "debatable whether [this court] was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). The Court therefore **denies** a certificate of appealability.

**IT IS SO ORDERED.**

Date: 8/27/2018

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

Distribution:

LENARD DIXON
07688-031
ATWATER - USP
ATWATER U.S. PENITENTIARY
Inmate Mail/Parcels
P.O. BOX 019001
ATWATER, CA 95301

William Lance McCoskey
UNITED STATES ATTORNEY'S OFFICE
william.mccoskey@usdoj.gov